UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MAGRETH MUTUA, PETER MUTUA, JOHN M. PERUSSE, DIANE C. PERUSSE, ROBERT J. PIGOZZI, and LAURA M. PIGOZZI,<br><br>Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK NATIONAL TRUST COMPANY and SHAPIRO & ZIELKE, LLP,<br><br>Defendants. | Case No. 11-CV-3761 (PJS/AJB)<br><br><br>ORDER |

William B. Butler, BUTLER LIBERTY LAW, LLC, for plaintiffs.

Charles F. Webber, Trista M. Roy, FAEGRE BAKER DANIELS LLP; Fredrick S. Levin, DYKEMA GOSSETT LLP; Dawn N. Wiliams, DYKEMA GOSSETT PLLC; Patrick J. Lindmark, Earnest F. Peake, LEONARD, O'BRIEN, SPENCER, GALE & SAYRE, LTD; Jared D. Kemper, FOLEY & MANSFIELD, PLLP, for defendant Deutsche Bank National Trust Company.

Kalli L. Ostlie, Amanda M. Govze, SHAPIRO & ZIELKE, LLP, for defendant Shapiro & Zielke, LLP.

Plaintiffs, who are all Minnesota residents, brought this action in state court to challenge the validity of the mortgages on their properties. Although one of the defendants — Shapiro & Zielke, LLP ("Shapiro") — is also a Minnesota resident, defendants nevertheless removed the case to federal court, arguing that Shapiro was fraudulently joined and that, because Shapiro was fraudulently joined, this Court has diversity jurisdiction under 28 U.S.C. § 1332.

This matter is before the Court on plaintiffs' motion to remand and defendants' motions to dismiss and for sanctions. Under the unusual circumstances of this case, the Court finds that

remand is required.  Accordingly, the Court grants plaintiffs' motion and denies defendants' motions.

## I.  BACKGROUND

Plaintiffs are three married couples who each own property in Minnesota.  The potential claims against Shapiro, however, involve only the property belonging to the Pigozzis.  The Court accordingly describes only the facts relevant to the Pigozzi property.

On November 11, 2004, the Pigozzis borrowed $736,000 from Town and Country Credit Corp. ("T&C").  Am. Compl. Ex. B.  On the same date, the Pigozzis granted a mortgage securing the debt to T&C.  Am. Compl. Ex. 3.  The Pigozzis later defaulted on their loan.  In October 2011, Shapiro recorded a document in what was apparently the first of several attempts to foreclose on the Pigozzis' mortgage.  Kemper Decl. Ex. 7.  In between the date that the mortgage was signed (November 2004) and the date of the first attempt to foreclose on the mortgage (October 2011), the Pigozzis' mortgage was assigned seven times to and from defendant Deutsche Bank National Trust Company ("Deutsche") acting as trustee for four different entities.  Because these entities have long and confusingly similar names, the Court will refer to them as:

  (1) Deutsche/Ameriquest/R10;[1]

  (2) Deutsche/Registered/R10;[2]

---

[1] The full name of this entity is Deutsche Bank National Trust Company, as Trustee of Ameriquest Mortgage Securities, Inc. Asset-Backed Pass Through Certificates Series 2004-R10, under the Pooling and Servicing Agreement Dated as of October 1, 2004, Without Recourse. *See* Kemper Decl. Ex. 2.

[2] The full name of this entity is Deutsche Bank National Trust Company, as Trustee, in
(continued...)

(3) Deutsche/Registered/10;[3] and

(4) Deutsche/Certificate/10.[4]

The seven assignments to and from these entities are as follows:

*First*, in an assignment recorded on December 14, 2007, T&C assigned the mortgage to Deutsche/Ameriquest/R10. Kemper Decl. Ex. 2. The assignment, which was drafted by Shapiro, was executed on December 4, 2007, and stated that it was effective as of November 30, 2007. *Id.*

*Second*, in an assignment recorded on June 30, 2008, Deutsche/Ameriquest/R10 assigned the mortgage to a second Deutsche entity: Deutsche/Registered/R10. Kemper Decl. Ex. 3. The assignment, also drafted by Shapiro, was executed on June 20, 2008. *Id.*

*Third*, in an assignment recorded on February 17, 2009, T&C purported to assign the mortgage to Deutsche/Ameriquest/R10, even though T&C did not appear to have title to the mortgage. Butler Aff. Mar. 28, 2012 [hereinafter "Butler Aff."] Ex. 1. The assignment was executed on January 20, 2009 and stated that it was effective as of February 11, 2009. *Id.* After this assignment was recorded, there were two different record owners of the mortgage: Deutsche/Registered/R10 and Deutsche/Ameriquest/R10. In their briefing, defendants did not

---

[2](...continued)
trust for the registered holders of Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through Certificates, Series 2004-R10. *See* Kemper Decl. Ex. 3.

[3]The full name of this entity is Deutsche Bank National Trust Company, as Trustee in trust for the Registered Holders of Ameriquest Mortgage Securities Inc. Asset Backed Pass-Through Certificates, Series 2004-10. *See* Kemper Decl. Ex. 4.

[4]The full name of this entity is Deutsche Bank National Trust Company, as Trustee in trust for the benefit of the Certificateholders for Ameriquest Mortgage Securities Inc. Asset Backed Pass-Through Certificates, Series 2004-10. *See* ECF No. 42.

even mention this strange assignment, while at the same time arguing that there was a clear and uninterrupted chain of title in their favor.  *See* ECF No. 40 at 7.

*Fourth*, in an assignment recorded on May 13, 2009, Deutsche/Ameriquest/R10 — one of the two record holders of the mortgage — purported to assign the mortgage to a third Deutsche entity: Deutsche/Certificate/10.  ECF No. 42.  This assignment was executed on May 1, 2009 and stated that it was effective as of March 31, 2009.  *Id.*  As of the date of this assignment, then, there were still two record holders of the mortgage: Deutsche/Registered/R10 and Deutsche/Certificate/10.  As was true with respect to the preceding assignment, defendants failed to even mention this assignment in their briefing.

*Fifth*, in an assignment recorded on June 15, 2009, a fourth Deutsche entity — Deutsche/Registered/10 — purported to assign the mortgage to Deutsche/Certificate/10.  Kemper Decl. Ex. 4.  This assignment was executed on June 8, 2009 and stated that it was effective as of May 26, 2009.  *Id.*  This assignment was curious for two reasons:  First, Deutsche/Registered/10 did not appear to *have* record title to assign.  Second, Deutsche/Registered/10 purported to assign record title to an entity that already had record title to the mortgage — or, more accurately, to an entity that was one of two holders of record title to the mortgage.  Following this purported assignment, then, there remained two record holders of the mortgage:  Deutsche/Registered/R10 and Deutsche/Certificate/10.  (Defendants mentioned this assignment in their briefing, but they erroneously identified the assignor as Deutsche/Registered/R10.  *See* ECF No. 23 at 7.)

*Sixth*, in an assignment recorded on February 9, 2011, Deutsche/Certificate/10 (which was one of the two record owners) purported to assign the mortgage to Deutsche/Ameriquest/R10 (which was not one of the two record owners).  Kemper Decl. Ex. 6.

This assignment was executed on December 17, 2010 and is dated December 9, 2010. *Id.* Standing alone, then, this assignment perpetuated the double ownership of the Pigozzis' mortgage. This assignment was drafted by Shapiro.

*Seventh*, in a "corrective assignment" that was also recorded on February 9, 2011 — and that was also drafted by Shapiro — Deutsche/Registered/R10 purported to assign the mortgage to Deutsche/Certificate/10. Kemper Decl. Ex. 5. This "corrective assignment" was executed on January 31, 2011, but it purported to be effective as of June 8, 2009 — a year and a half earlier. *Id.* This "corrective assignment" explained that it "is being recorded to Correct the signor of the Assignor in Assignment of Mortgage Document dated June 8, 2009, [and] recorded June 15, 2009 . . . ." *Id.*

As described above, the assignment to which the "corrective assignment" referred — that is, the assignment executed on June 8, 2009 — purported to assign the mortgage from Deutsche/Registered/10 to Deutsche/Certificate/10. If the "corrective assignment" was indeed effective in retroactively "correcting" this assignment, then the "corrected" assignment transferred title to the mortgage from one of the two record owners at that time (Deutsche/Registered/R10) to the other (Deutsche/Certificate/10). In other words, if the "corrective assignment" was effective, then Deutsche/Certificate/10 — and *only* Deutsche/Certificate/10 — had title to the Pigozzis' mortgage as of June 8, 2009. Deutsche/Certificate/10 then assigned the mortgage to Deutsche/Ameriquest/R10 in the assignment executed on December 17, 2010, and recorded on February 9, 2011 (discussed above). Kemper Decl. Ex. 6. It is Deutsche/Ameriquest/R10 that now claims to have the right to foreclose on the Pigozzis' mortgage.

## II. ANALYSIS

### A. *Standard of Review*

Defendants removed this case from state court, seeking to invoke this Court's diversity jurisdiction. *See* ECF No. 1. Because plaintiffs and Shapiro are all citizens of Minnesota, however, the requisite complete diversity of citizenship is lacking. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806) (adopting the complete-diversity rule). But defendants contend that the Court should disregard the claims against Shapiro under the doctrine of fraudulent joinder. *See Simpson v. Thomure*, 484 F.3d 1081, 1083 (8th Cir. 2007) (the right of an out-of-state defendant to remove a diversity suit to federal court cannot be defeated by the fraudulent joinder of a resident defendant).

As the removing parties, defendants bear the burden of establishing federal jurisdiction. *Altimore v. Mount Mercy Coll.*, 420 F.3d 763, 768 (8th Cir. 2005) (removing party bears the burden of establishing jurisdiction); *Leonard v. St. Joseph Lead Co.*, 75 F.2d 390, 395 (8th Cir. 1935) (removing party bears the burden of establishing fraudulent joinder). To establish fraudulent joinder, a defendant must go beyond demonstrating that the claims against the nondiverse defendant should be dismissed under Fed. R. Civ. P. 12(b)(6). *Block v. Toyota Motor Corp.*, 665 F.3d 944, 948 (8th Cir. 2011). Instead, the defendant must show that "'there exists no reasonable basis in fact and law supporting a claim against the resident defendant[].'" *Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002, 1004 (8th Cir. 2006) (quoting *Filla v. Norfolk S. Ry.*, 336 F.3d 806, 810 (8th Cir. 2003)). The joinder of a nondiverse defendant is not fraudulent where "'there is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved.'" *Block*, 665 F.3d at 948 (quoting *Junk v. Terminix Int'l*

*Co.*, 628 F.3d 439, 446 (8th Cir. 2010)).  In appropriate cases, courts may take a limited look at evidence outside the pleadings in making this inquiry.  *See Masepohl v. Am. Tobacco Co.*, 974 F. Supp. 1245, 1250 (D. Minn. 1997); *see also Block*, 665 F.3d at 948 ("In fraudulent joinder cases, some courts examine material beyond the complaint's allegations to 'determine if there is any factual support' for the claims against the allegedly fraudulently joined defendant." (quoting *Masepohl*)).  All doubts about federal jurisdiction must be resolved in favor of remand.  *Block*, 665 F.3d at 948.  In short, in deciding whether a defendant has been fraudulently joined, a court analyzes the claims against that defendant under something that is more akin to the Rule 11(b) standard than to the Rule 12(b)(6) standard.

### B.  Plaintiffs' Claims

This is one of dozens of cases brought by plaintiffs' attorney, William Butler, in which he challenges the validity of the mortgages on his clients' properties.  The Court has recently had occasion to address, and reject, many of the arguments that Butler has been making on his clients' behalf.  *See Welk v. GMAC Mortg., LLC*, No. 11-2676, 2012 WL 1035433 (D. Minn. Mar. 29, 2012).  In particular, the Court rejected the *Welk* plaintiffs' core legal claim — which the Court referred to as the "show-me-the-note" claim — that a mortgage is not valid (and cannot be foreclosed upon) unless the mortgagee holds the note secured by the mortgage.  As the Court explained at length in *Welk*, this legal theory has been expressly rejected by, among other courts, the Minnesota Supreme Court and the United States Court of Appeals for the Eighth Circuit.  *See Jackson v. Mortg. Elec. Registration Sys., Inc.*, 770 N.W.2d 487 (Minn. 2009); *Stein v. Chase Home Fin., LLC*, 662 F.3d 976 (8th Cir. 2011).  Because this show-me-the-note theory is

frivolous, the Court assessed sanctions against Butler for pursuing several claims based on the theory in *Welk*.

Plaintiffs' original complaint in this case was virtually a carbon copy of the complaint that the Court found sanctionable in *Welk*. Shortly after the Court issued an order in *Welk* requiring Butler to show cause why he should not be sanctioned, however, Butler filed an amended complaint in this case. *See* ECF No. 11. For the most part, Butler dropped various iterations of his show-me-the-note claim[5] and added new claims. Among the new claims in the amended complaint is the claim that "[t]he chain of title to Plaintiffs' Mortgages is broken and Defendants have no[] right, title or interest in Plaintiffs' property[.]" Am. Compl. ¶ 16.

---

[5]Butler has continued to pursue a show-me-the-note claim that is based on the language of his clients' notes and mortgages rather than on Minnesota statutory or common law. This "contractual" show-me-the-note claim is not the same as the show-me-the-note claim that was rejected in *Jackson* and *Stein* and sanctioned in *Welk*. Those cases rejected the argument that, as a matter of Minnesota statutory or common law, someone who holds a mortgage but not a note cannot foreclose. It is, however, theoretically possible for the parties to a note and mortgage to agree that only someone who holds both can foreclose on the mortgage. (As a practical matter, though, it seems highly unlikely that any lender would agree to such a provision — or that any borrower would seek such a provision.)

That said, Butler's contractual show-me-the-note claims appear to be based on an untenable reading of his clients' notes and mortgages. Moreover, when he was asked about the contractual claims at the hearing in this matter, Butler responded by making arguments that sounded a lot like the arguments that were rejected in *Jackson* and *Stein* and sanctioned in *Welk*. Neither the Court's decision to remand this case — nor any comments made by the Court at the hearing — are intended to suggest that Butler's "contractual" show-me-the-note claims have more merit than his "public-law" show-me-the-note claims.

At least on its face, this is *not* a show-me-the-note claim.[6] It is not a claim that plaintiffs' mortgages are invalid because the entities that hold the mortgages do not also hold the notes. Instead, it is a claim that the defendants do not hold the *mortgage*s because of defects in the chain of title to those mortgages. This claim, then, differs significantly from the claims that the Court rejected as frivolous in *Welk*. In *Welk*, the record established — and the plaintiffs did not dispute — that the defendants held title to the mortgages. *Welk*, 2012 WL 1035433, at *4 & n.1. Here, though, plaintiffs claim that the chain of title to their mortgages is defective.

In their complaint, plaintiffs pleaded no facts whatsoever in support of their assertion that "[t]he chain of title to Plaintiffs' Mortgages is broken." Am. Compl. ¶ 16. Thus, as pleaded in the complaint, plaintiffs' claim is insufficient to survive a motion to dismiss. But the question is not whether plaintiffs' claims can survive a motion to dismiss; it is whether, after the Court looks beyond the complaint's allegations to ascertain whether there is factual support for those allegations, "'there is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved.'" *Block*, 665 F.3d at 948 (quoting *Junk*, 628 F.3d at 446).

The publicly recorded documents that the parties have submitted demonstrate that the chain of title to the Pigozzis' mortgage is a mess. The problems begin with the assignment recorded on February 17, 2009 that purported to assign the mortgage from T&C, the original

---

[6]As the Court noted in *Welk*, Butler often recasts his show-me-the-note argument in creative ways. *See Welk*, 2012 WL 1035433, at *8-10. Here, for example, it is possible that Butler means to allege that the chain of title to a mortgage was broken when ownership of the note and the mortgage diverged. Such an argument would simply be another way of arguing that the mortgagee must hold the note, and thus such an argument would be frivolous. But because the publicly recorded documents in this case demonstrate that the chain of title to the Pigozzis' *mortgage* may be defective — regardless of who held the note — the Court will give Butler the benefit of the doubt and assume that he is making a legitimate argument about the chain of title to the mortgage and not an illegitimate argument about the ownership of the note.

lender, to Deutsche/Ameriquest/R10. This assignment, which was the third in the recorded chain of title, mirrors the first recorded assignment from T&C to Deutsche/Ameriquest/R10. But at the time of this third assignment, neither T&C nor Deutsche/Ameriquest/R10 had record title. As a result, this assignment created several problems. First, it created two different record owners of title to the mortgage: Deutsche/Registered/R10 and Deutsche/Ameriquest/R10. Second, because T&C did not have record title at the time that it purported to make the assignment, the assignment suggests the possibility of one or more problems not otherwise apparent in the recorded chain of title. It could mean, for example, that there is an earlier unrecorded assignment back to T&C. Alternatively, it could mean that T&C had some reason to believe that there was a problem with the original assignment, and that this later assignment was an effort to correct that problem. If that were the case, the correction would create its own set of complications, given that the entity to whom the corrective assignment was made had already assigned title to a different entity.

The problems do not stop there. On June 15, 2009, yet another assignment was recorded in which the assignor (Deutsche/Registered/10) did not have record title at the time that it purported to make the assignment — suggesting, again, the possibility of an earlier unrecorded assignment to that entity. And finally, there is the seventh (corrective) assignment that was executed *after* the sixth assignment was executed but that purports to be effective *before* the sixth assignment was executed. While defendants identify the corrective assignment, they do not mention that it was executed after an intervening assignment, nor do they address whether rewriting history in this manner is permissible under Minnesota law. *See In re Banks*, 457 B.R. 9, 11 n.8 (B.A.P. 8th Cir. 2011) (noting in dicta that "we have serious concerns about the validity

and effect of the 'Corrective Assignment'" and that "[a]t the least, the Corrective Assignment would appear to create a cloud on Kondaur's right to foreclose, necessitating a judicial foreclosure").

In short, there are multiple defects apparent on the face of the recorded chain of title to the Pigozzis' mortgage. Defendants do not identify or acknowledge these defects in their briefing; indeed, as noted above, they do not even mention two of the seven recorded assignments (including the assignment that first split the chain of title). At oral argument, defendants took the position that the final corrective assignment effectively united the chain of title and, in any event, that assignments from entities that did not have record title at the time are legal nullities. Defendants may be correct. Nevertheless, in light of the mess that defendants made of the chain of title, the Pigozzis certainly have reason to be concerned about who has title to their mortgage.

"The purpose of the statutory recording requirements is to ensure that a mortgagor has notice and an opportunity to redeem." *Beecroft v. Deutsche Bank Nat'l Trust Co.*, 798 N.W.2d 78, 83 (Minn. Ct. App. 2011). In accordance with this purpose, "'[i]t is the plain intent of that statute that it is a condition precedent to the right to foreclose by advertisement that the title of an assignee of a mortgage appear of record, and of record in such manner that evidence extraneous to the record will not be needed to put [the title of the assignee of the mortgage] beyond reasonable question.'" *Jackson*, 770 N.W.2d at 497-98 (quoting *Soufal v. Griffith*, 198 N.W. 807, 808 (Minn. 1924)). It may well be that, after a full record is developed, the foreclosing Deutsche entity will be able to prove that it has legal and record title to the Pigozzis' mortgage. But given the apparent defects in the chain of title, the Court cannot say that title to the mortgage

is beyond reasonable question.  *Cf. Ruiz v. 1st Fid. Loan Serv., LLC*, No. A11-1081, 2012 WL 762313, at *2-4 (Minn. Ct. App. Mar. 12, 2012) (explaining that strict compliance with the foreclosure-by-advertisement statute is required and holding that a recorded assignment was legally insufficient because it inaccurately stated the assignee's legal name).

All of this is to say that, in the Court's view, the Pigozzis have a plausible quiet-title claim against Deutsche — or at least the Pigozzis *would* have such a claim, if they had pleaded the facts that they set forth in their brief.  For purposes of plaintiffs' motion to remand, however, the crucial question is not whether the Pigozzis' claim against Deutsche would survive a Rule 12(b)(6) motion; the question is whether the Pigozzis have a reasonable basis in fact and law to bring a claim against *Shapiro*.  The Court's analysis of this question is severely hampered by the fact that, as noted above, defendants said not one word about the apparent defects in the Pigozzi chain of title.  Indeed, defendants did not even identify all of the assignments of the Pigozzi mortgage.  Given the fact that defendants have provided so little information and argument, the Court cannot say that defendants have carried their burden to show that there is no reasonable basis in fact and law for the Pigozzis to state some kind of claim against Shapiro.

Under Minnesota law, an attorney may be liable to a third-party non-client when the attorney "knowingly participates with his client in the perpetration of a fraudulent or unlawful act."  *McDonald v. Stewart*, 182 N.W.2d 437, 440 (Minn. 1970).  The fact that the attorney's allegedly wrongful conduct was within the scope of his role as an attorney does not by itself render him immune.  *Cf. Rucker v. Schmidt*, 768 N.W.2d 408, 411-12 (Minn. Ct. App. 2009) (attorney who allegedly helped client fraudulently undervalue an asset during a dissolution proceeding was not immune from liability to client's ex-wife).

Shapiro was involved in drafting and recording four of the seven record assignments of the Pigozzis' mortgage. Shapiro also drafted and recorded several foreclosure notices. *See* Kemper Decl. Ex. 7; ECF No. 42. The Shapiro-drafted assignments include both the corrective assignment and the assignment that would have immediately preceded the corrective assignment but for the purported effective date of the corrective assignment. Thus, there is a basis to allege that Shapiro was aware of defects in the record title and that, with knowledge of these defects, Shapiro nevertheless chose to pursue foreclosure by advertisement.

It is true, as defendants argue, that an attorney is not liable to non-clients for mere negligence (absent special circumstances not relevant here). *See McIntosh Cnty. Bank v. Dorsey & Whitney, LLP*, 745 N.W.2d 538, 545 (Minn. 2008) ("The general rule in legal malpractice is that, in the absence of fraud or another improper motive, an attorney is liable for professional negligence only to a person with whom he has an attorney-client relationship."). Thus, the Court agrees with defendants that Shapiro could not be held liable merely for failing to investigate whether the entities on behalf of whom it drafted and recorded assignments and notices of foreclosure actually had proper title. And it may well be that Shapiro will ultimately be found to have done nothing improper.

At this stage, however, the Court is tasked only with determining whether defendants have carried their burden of demonstrating that plaintiffs have no colorable claim against Shapiro. Under the unusual circumstances of this case — a case involving an unusually

problematic chain of title to a mortgage and defendants who chose not to say a word about those problems — the Court holds that defendants have not met their burden.[7]

The Court emphasizes that its holding is very narrow. The Court is not holding that any irregularity in a chain of title will give rise to a colorable claim against a law firm that later tries to correct the chain of title or conduct a foreclosure by advertisement. Nor is the Court holding that plaintiffs have properly pleaded a claim against Shapiro (or, indeed, against any other defendant) under the Federal Rules of Civil Procedure; to the contrary, the Court is quite certain that plaintiffs have *not* pleaded a plausible claim against Shapiro, given that none of the facts about the Pigozzi assignments are in plaintiffs' amended complaint. Instead, the Court is holding that, given defendants' failure to mention the irregularities in the Pigozzis' chain of title in their briefing, much less address the implications of those irregularities for potential claims against Shapiro, defendants have not met their burden of showing fraudulent joinder. Accordingly, the Court grants plaintiffs' motion to remand and denies defendants' motions.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

---

[7]Shapiro suggested at oral argument that, due to word limitations, defendants were not able to brief every issue. A review of the record demonstrates, however, that defendants used less than a third of the applicable word-count limit in briefing the motions to dismiss and remand. *See* ECF No. 12 (limiting defendants to 24,000 words on the motions to dismiss); ECF No. 32 (ordering supplemental briefing of no more than 3,000 words); ECF Nos. 23-1, 27-1, 40-1 (defendants' word-count-compliance certificates). The Court does not wish to fault — and indeed very much appreciates — defendants' efforts to be concise. But there is a difference between being concise and saying absolutely nothing about some of the most critical issues in the case. Defendants could easily have addressed the problems with the Pigozzi chain of title without coming close to exhausting their word limitations.

1. Plaintiffs' motion to remand [ECF No. 13] is GRANTED.

2. This matter is hereby REMANDED to the Minnesota District Court, Fourth Judicial District.

3. Defendants' motions to dismiss [ECF Nos. 3, 5, 7, 9, 15, 17] are DENIED AS MOOT.

4. The motion of defendant Deutsche Bank National Trust Company for sanctions [Docket No. 33] is DENIED.

Dated: April 30, 2012                                s/Patrick J. Schiltz
                                                    Patrick J. Schiltz
                                                    United States District Judge